**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:21-cv-236-MR-WCM**

| | |
|---|---|
| **AFARRAH CHARDAE SANDERS, as the Administrator of the Estate of JACKIE ISRAEL SANDERS,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **RYAN BAILEY, in his individual capacity, CODY MCINTYRE, in his individual capacity, DEREK DEATON, in his individual capacity, HUNTER HAYNES, in his individual capacity, JEFF SMITH, in his individual capacity, JOSHUA KUJAWA, in his individual capacity, MATTHEW OWENS, in his individual capacity, WILMER CHAVEZ-PEREZ, in his individual capacity, CRAIG KELLER, in his individual capacity, and in his official capacity, ELIZABETH SPROUSE, in her individual capacity, JOHN COOLEY, in his individual capacity, JOSHUA GOODWIN, in his individual capacity, CHRIS FRANCIS, The Sheriff of Rutherford County, in his Official Capacity, TIM WRIGHT, The Sheriff of Polk County, and in his official capacity,** &#124; <br><br> **Defendants.** | **AMENDED COMPLAINT** <br> (Jury Trial Requested) |

Plaintiff, Afarrah Chardae Sanders, as Personal Representative of the Estate of Jackie Israel Sanders, with the written consent of counsel for the defendants, hereby files this Amended Complaint, complaining of the above-named Defendants alleges and shows as follows:

## INTRODUCTION

1. This cause of action arises from the wrongful death of Jackie Israel Sanders on January 24, 2020, in the custody of the Rutherford County Sheriff's Office.

1

2. Mr. Sanders was pronounced dead at 6:09p.m., in the Rutherford County Detention Center at 198 North Washington Street, Rutherfordton, North Carolina.

3. Jackie Israel Sanders was a 33-year-old black man who lived in Forest City, Rutherford County, North Carolina.

4. The plaintiff, as the Administrator of the Estate of Jackie Israel Sanders, brings this action as a survival of claims action pursuant to NCGS § 28A-18-1.

5. This case is to recover for money damages for the harms and losses to Mr. Sanders' children brought pursuant to 42 U.S.C. § 1983 for the deprivation under color of state law of Jackie Israel Sanders' clearly established rights under the Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

6. This case also seeks money damages for negligence, gross negligence, willful and wanton, and intentional conduct, causing harms and losses to Mr. Sanders' children as beneficiaries pursuant to the North Carolina Wrongful Death Act, N.C.G.S. § 28A-18-2.

**JURISDICTION AND VENUE**

7. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

8. This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983, 1988, and supplemental jurisdiction to hear the common law claims under 28 U.S.C. § 1367.

9. Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this case occurred in the Western District of North Carolina in Rutherford County.

10. Upon information and belief, the plaintiff's decedent and all of the defendants reside, or resided, in this Judicial District. The plaintiff is the duly appointed Administrator of the Estate of Jackie Israel Sanders and was appointed by the Clerk of Rutherford County in estate file number 21 E 537.

## THE PARTIES

11. Plaintiff re-alleges and incorporates herein all preceding paragraphs as if fully set forth herein.

12. The plaintiff is the Administrator of the Estate of Jackie Israel Sanders and was appointed by the Clerk of Rutherford County in estate file number 21 E 537. Mr. Sanders was a citizen and resident of Rutherford County, North Carolina, at the time of his death on January 24, 2020. The beneficiaries of the Estate of Jackie Israel Sanders are his three minor children: Jamya Sanders, a daughter age 15, Marquez Sanders, a son age 11, and Cameron Sanders, a son age 7.

13. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Ryan Bailey (hereinafter, "Bailey") was a resident of Rutherford County, North Carolina, was a Corporal assigned to the Rutherford County Sheriff's Office, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

14. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Derek Deaton (hereinafter, "Deaton") was a resident of Rutherford County, North Carolina, was a Deputy assigned to the Rutherford County Sheriff's Office, was employed by and an agent of the Sheriff of Rutherford

County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

15. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Cody McIntyre (hereinafter, "McIntyre") was a resident of Rutherford County, North Carolina, was a Deputy assigned to the Rutherford County Sheriff's Office, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

16. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Hunter Haynes (hereinafter, "Haynes") was a resident of Rutherford County, North Carolina, was a Deputy assigned to the Rutherford County Sheriff's Office, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

17. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Jeff Smith (hereinafter, "Smith") was a resident of Polk County, North Carolina, was a Deputy or other officer assigned to the Polk County Sheriff's Office, was employed by and an agent of the Sheriff of Polk County, and was in a Sheriff's uniform, acting individually, and under the color of state law. Further, Defendant Jeff Smith was employed by and/or an agent of the Sheriff of Rutherford County, acting individually, and under the color of state law, pursuant to a Joint Spring Interdiction Operation agreement which was a Rutherford County Sheriff's Office operation assisted by the Polk County Sheriff's Office and other agencies.

4

18. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Josh Kujawa (hereinafter, "Kujawa") was a resident of Polk County, North Carolina, was a Deputy or other officer assigned to the Polk County Sheriff's Office, was employed by and an agent of the Sheriff of Polk County, and was in a Sheriff's uniform, acting individually, and under the color of state law. Further, Defendant Josh Kujawa was employed by and/or an agent of the Sheriff of Rutherford County, acting individually, and under the color of state law, pursuant to a Joint Spring Interdiction Operation agreement which was a Rutherford County Sheriff's Office operation assisted by the Polk County Sheriff's Office and other agencies.

19. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Matthew Owens (hereinafter, "Owens") was a resident of Rutherford County, North Carolina, was a Sergeant assigned to the Rutherford County Sheriff's Office, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

20. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Wilmer Chavez-Perez (hereinafter, "Perez") was a resident of Rutherford County, North Carolina, was a Patrol Deputy assigned to the Rutherford County Sheriff's Office, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

21. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Craig Keller (hereinafter, "Keller") was a resident

of Rutherford County, North Carolina, was a Deputy assigned to the Rutherford County Sheriff's Office, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

22. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Elizabeth Sprouse (hereinafter, "Sprouse") was a resident of Rutherford County, North Carolina, was a Shift Corporal assigned to the Rutherford County Detention Center, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

23. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant John Cooley (hereinafter, "Cooley") was a resident of Rutherford County, North Carolina, was a Deputy assigned to the Rutherford County Detention Center, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

24. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Joshua Goodwin (hereinafter, "Goodwin") was a resident of Rutherford County, North Carolina, was a Deputy assigned to the Rutherford County Detention Center, was employed by and an agent of the Sheriff of Rutherford County, and was in a Sheriff's uniform, acting individually, and under the color of state law.

25. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Chris Francis (hereinafter, "Francis") was a resident of Rutherford County, North Carolina, was the Sheriff of Rutherford County,

was in charge of and responsible for the Rutherford County Detention Center, and was acting officially, as may be more specifically alleged, and under the color of state law. As the Sheriff of Rutherford County, this defendant is subject to suit as a local official holding office created under the North Carolina Constitution.

26. Upon information and belief, the Rutherford County Sheriff's Department has purchased liability insurance coverage for liabilities incurred by the operation of the Rutherford County Sheriff's office and the operation of the Rutherford County Detention Center and has waived immunity by the purchase of liability insurance. The amount and policy limits of said insurance will be discovered in this action.

27. Upon information and belief, at the various times giving rise to the causes of action set forth in this Complaint, Defendant Tim Wright (hereinafter, "Wright") was a resident of Polk County, North Carolina, was the Sheriff of Polk County, and was acting officially, as may be more specifically alleged, and under the color of state law. As the Sheriff of Polk County, this defendant is subject to suit as a local official holding office created under the North Carolina Constitution.

28. Upon information and belief, the Polk County Sheriff's Department has purchased liability insurance coverage for liabilities incurred by the operation of the Polk County Sheriff's office and has waived immunity by the purchase of liability insurance. The amount and policy limits of said insurance will be discovered in this action.

29. Due to the changing angles of the body worn cameras, and the fact that the cameras frequently recorded voices without faces, the defendants Bailey, McIntyre, Deaton, Haynes, Smith, Kujawa, Owens, Chavez-Perez and Keller, either collectively or in

groups of less than all of them, may hereinafter be referred to as the "arresting officers" or "arresting defendants."

30. The defendants Keller, Sprouse, Cooley and Goodwin may hereafter be referred to as the "detention officers" or "detention defendants."

## FACTS

31. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

32. Most of the events described in this complaint were recorded by audio and video recording devices by the defendants in their capacity as Rutherford County Sheriff's officers. These recordings include, but are not limited to officer body cameras, onboard officer car cameras, jail video cameras, and dispatch audio recordings. To the extent possible, the plaintiff would incorporate by reference all these recordings, which are part of the North Carolina State Bureau of Investigation file on this case, Number 2020-00235, and which have been provided pursuant to a Rutherford County Consent Protective Order to both the plaintiff's and the defendants' counsel.

33. Upon information and belief, all the named defendants have, or should have, received Basic Law Enforcement Training (BLET), under a prescribed curriculum of the North Carolina Department of Justice.

34. Upon information and belief, the detention officers, and to the extent that it appears that some of the policies apply to all Rutherford County Sheriff's department officers, have received training and are subject to the requirements of Policy and Procedure Manual of the Rutherford County Detention Center.

35. On January 24, 2020, the Rutherford County Sheriff's Office was engaged in a multi-agency Criminal Interdiction Operation in Rutherford County.

36. The Rutherford County Sheriff's Office had a written 2019 Spring Interdiction Operation plan which was the policy of the defendant Chris Francis as the Sheriff of Rutherford County.

37. The Rutherford County Sheriff's Department was "conducting aggressive enforcement of all North Carolina traffic and criminal laws along Rutherford County's roadways."

38. According to the Operation Agreement, this was a Rutherford County Sheriff's Office operation. However, the Rutherford County Sheriff's Office was assisted by the Polk County Sheriff's Office, Rutherfordton Police Department, Forest City Police Department, and The N.C. Department of Public Safety. Homeland Security Investigations Task Force Officers and Special Agents were also on-scene during the operation to facilitate information sharing, conduct debriefings and interviews, to help determine probable cause of asset seizures and conduct controlled deliveries should the need arise. The federal agents were also available to assist with large narcotic or U.S. Currency seizures.

39. All law enforcement officers assisting in the operation were given copies of the Operation Plan.

40. In addition to the stated plan of "aggressive enforcement," the Operation Plan also contained directions to the Rutherford Regional Hospital and informed officers of several routes in the event of an emergency.

41. Defendant, Sergeant Matthew Owens was the highest-ranking officer of the Rutherford County Criminal Interdiction Team, and he was present, as a representative of Rutherford County Sheriff's Department, on the scene when Jackie Israel Sanders was arrested.

42. Defendant, Patrol Officer Wilmer Chavez-Perez was also a leader or member of the Rutherford County Criminal Interdiction Team.

43. Rutherford County deputies, defendants, Corporal Ryan Bailey and Cody McIntyre were taking part in the multi-agency interdiction operation in Rutherford County.

44. Defendants Bailey and McIntyre were riding in Bailey's marked patrol vehicle when they saw a white Buick sedan traveling south on US 221, in the vicinity of Ray's Mini-Mart, at 4100 US-221, Forest City, North Carolina.

45. Upon getting behind the Buick, it pulled into Ray's Mini-Mart.

46. Surveillance footage obtained from Ray's Mini-Mart showed the Buick pulling into the store at approximately 4:39 p.m.

47. The plaintiff's decedent, Jackie Israel Sanders, entered Ray's Mini Mart at approximately 4:41 p.m.

48. Mr. Sanders bought a lollypop and then he left.

49. Mr. Sanders continued south on US-221 at approximately 4:43 p.m.

50. Deputy Bailey considered this to be "suspicious or evasive behavior" and called out for other officers to be on the lookout for the white Buick sedan.

51. At approximately 4:53 p.m., defendant Bailey provided dispatch with the South Carolina registration plate number of LCH-195.

52. Defendant Bailey has stated that the tag displayed on the Buick came back to a Ford truck.

53. At approximately 4:57, defendant Bailey initiated a traffic stop of the Buick which was being driven by Jackie Israel Sanders.

54. After stopping the vehicle, defendant Bailey activated his body-worn camera.

55. When the body worn camera was activated, defendants Bailey and McIntyre had already drawn their pistols and were pointing them at Mr. Sanders. Mr. Sanders had both hands in the air above his head.

56. For twelve seconds, defendant Bailey pointed his pistol at Jackie Sanders. Upon information and belief, there is no audio recording of what was said by the deputies to Mr. Sanders during this time when Mr. Sanders had his hands above his head.

57. After defendant Bailey activated the audio recording on his body-worn camera, he and defendant McIntyre continued pointing their guns at Mr. Sanders while he continued to hold his hands in the air.

58. Upon information and belief, Mr. Sanders asks the officers why he is being stopped or arrested.

59. Defendant Bailey is heard stating, "I will tell you in just a minute," and "Walk towards me."

60. During the next 24 seconds, Jackie Sanders continues holding his hands above his head while defendants Bailey and McIntyre continue to point their guns at him. Defendant Bailey continues to shout, "Walk towards me."

61. At this point, the two officers had been pointing guns at Mr. Sanders for over 36 seconds without stating why he was stopped or why he was being arrested. Jackie Israel Sanders then fled from Defendants Bailey and McIntyre.

62. Defendants Bailey and McIntyre requested additional officers for back up.

63. Numerous officers from the multi-agency Interdiction Operation, as well as other officers in the vicinity, responded to the area where Mr. Sanders was stopped.

64. Defendants Bailey and McIntyre pursued Mr. Sanders approximately 300-400 yards to a nearby wooded thicket.

65. Defendants Deaton and Haynes arrived on the scene just as Mr. Sanders fled on foot, and they also pursued Mr. Sanders to the wooded thicket.

66. Defendants Deaton and Haynes also activated their body-worn cameras and captured much of what followed.

67. In the next few minutes, numerous officers, including all the defendants designated above as "arresting officers" or "arresting defendants" arrived at the scene.

68. Defendant Bailey observed Mr. Sanders appearing to be tired and falling numerous times in the thicket before he was taken into custody. Upon information and belief, based on their proximity to Mr. Sanders and their focus on apprehending Mr. Sanders, the defendants Haynes, Deaton, and McIntyre would have also been able to observe Mr. Sanders falling numerous times in the thicket.

69. After falling numerous times, Mr. Sanders was then surrounded by officers, including defendants Bailey, Deaton, McIntyre, Haynes, and Chavez-Perez while he laid prone on the ground in the wooded thicket.

70. Mr. Sanders was held at gun point in the wooded thicket and threatened by defendant Deaton that a "bite dog," would "bite the fuck out" of him.

71. The arresting defendants had either a German shepherd or Belgium Malinois type K-9 that was barking loudly near Mr. Sanders.

72. Mr. Sanders laid down in the thicket as instructed and put his hands behind his back as instructed.

73. While lying on the ground, defendant Deaton or another officer asked Mr. Sanders if he swallowed anything. No response can be heard on the audio.

74. Defendants Bailey, Deaton, Haynes, McIntyre and Chavez-Perez and several other officers were close enough to hear this question.

75. As defendant Bailey put the cuffs on Mr. Sanders he stated, "You don't look like you exercise much, you're tired as hell."

76. At 5:03 p.m., defendant Bailey handcuffed Mr. Sander's hands behind his back and took him into the custody of the Rutherford County Sheriff's Office.

77. From the time Mr. Sanders was handcuffed and taken into custody, the defendants owed a higher duty of care to Mr. Sanders than to the general public at large.

78. Upon information and belief, each of the arresting defendants carried a radio and a phone, and each had the ability to independently call for EMS or other medical assistance during the time that Mr. Sanders was in custody.

79. Mr. Sander's hands remained cuffed behind his back for all the events described in this complaint from 5:03 p.m.

80. Mr. Sanders was bleeding from his face.

81. At all times relevant to this complaint, except after he became completely unconscious, Mr. Sanders was breathing heavily, gasping, panting, unable to hold his head up, and unable to walk.

82. Mr. Sanders was gasping and asked the officers "Can you let me rest?"

13

83. The arresting defendants refused to allow Mr. Sanders to rest even though he was in custody with his hands cuffed behind his back and obviously no threat to anyone.

84. The arresting officers, including defendant Bailey pulled Mr. Sanders to his feet and proceeded to "escort" or drag him from the wooded thicket with his arms pulled tightly behind him.

85. Mr. Sanders immediately staggered and fell hard to the ground. Mr. Sanders's eyes were closing, and he asked, "Can you give me five minutes?"

86. Defendant Bailey responded "If you hadn't ran, you could have all the time in the world. You decided to run. We ran every step you did."

87. Defendant Deaton then shouted at Mr. Sanders, "What's wrong with you?"

88. The arresting defendants lifted Mr. Sanders to his feet by his arms which were cuffed behind him.

89. Mr. Sanders leaned into a small tree that was not sufficient to support his weight and then fell sideways to the ground again.

90. One of the arresting defendants believed to be either Chavez-Perez or Haynes yelled, "Get up you fucking bitch!"

91. Another of the arresting defendants, believed to be defendant Deaton, shouted, "Let the dog bite his ass!"

92. Another of the arresting defendants screamed "What the fuck is wrong with you?"

93. Gasping, Mr. Sanders said, "Tired as hell."

94. One of the arresting defendants, believed to be Jeff Smith of the Polk County Sheriff's Department, shouted, "Start carrying him."

95. Defendants Keller and Kujawa appeared on the scene at about this time, although they may have been on the scene sooner.

96. The arresting defendants picked Mr. Sanders up by his arms pulling them high behind his back, a position similar to being hog tied.

97. The arresting defendants carried Mr. Sanders just a few feet before dropping him onto his chest and face.

98. At numerous times prior to his death, Mr. Sanders was either dropped or left face down with his hands cuffed behind him.

99. This position is known as prone restraint and is well known to law enforcement and medical personnel nationwide to be a position that causes restricted breathing and positional asphyxiation.

100. Mr. Sanders was now in the yard of a private residence within approximately 100 feet of a public road.

101. Upon information and belief, this location is approximately 12 minutes from the nearest EMS station, and closer if traveling at emergency traffic speeds. It is approximately the same distance to the nearest hospital.

102. Mr. Sanders laid on his face, appearing to be barely breathing and barely conscious.

103. After a few seconds, defendant Smith approached Mr. Sanders and started shouting, "You're a grown fucking man, get up and walk! You ain't gonna sit there and rest."

104. The arresting defendants again picked Mr. Sanders up from the ground and started marching him toward the road where the vehicles were.

105. After just a few steps, Mr. Sanders gasped, "Can I have my arms?"

106. Then Mr. Sanders staggered and fell forward again on his face.

107. While Mr. Sanders was lying on his face, defendant Owens apparently made the decision that Mr. Sanders was having a medical crisis and took out his radio. Defendant Owens asked the crowd of arresting defendants, "Need an ambulance?"

108. Lying on his face, barely conscious, Mr. Sanders did not answer or gesture.

109. Defendant Bailey shouted, "He doesn't need an ambulance, we ran every step he did, and we're all walking."

110. Others of the arresting defendants shouted things like, "There's nothing wrong with him," and, "We ran every step he did."

111. Although defendant Owens was the highest-ranking member of the Rutherford County Sheriff's Office Criminal Interdiction Team, defendant Owens complied with the mob of arresting defendants protesting the call for an ambulance and Owens put his radio away.

112. Defendant Owens stayed close to Mr. Sanders throughout the rest of the time prior to Mr. Sanders being taken to the Rutherford County Detention Center.

113. Officers on this scene in close proximity to defendants Bailey, McIntyre, Deaton, Haynes, Smith, Kujawa, Owens, Chavez-Perez and Keller stated a belief or questioned whether Mr. Sanders had ingested drugs or something else before his arrest. This occurred several more times before Mr. Sanders was placed in a vehicle for transportation to the Rutherford County Detention Center.

114. Upon information and belief, Defendants Bailey, McIntyre, Deaton, Haynes, Smith, Kujawa, Owens, Chavez-Perez and Keller either made the statements about swallowing drugs or they would have been able to hear the numerous statements and questions about ingesting drugs or some substance.

115. It was now clear, or should have been clear, to all the arresting defendants on this scene that Mr. Sanders was having a medical emergency from either "swallowing something" or from some other serious medical event such as cardiac distress or respiratory distress.

116. Upon information and belief, all the arresting defendants had been, or should have been, trained in North Carolina Basic Law Enforcement Training which included training on recognizing medical emergencies.

117. Mr. Sanders was now in a private residence yard approximately 60-75 feet from the public highway.

118. Defendants Bailey, Smith and Keller grabbed Mr. Sander's arms, lifted him with his arms and shoulders pulled back letting him hang from his arms.

119. The defendants Bailey, Smith and Keller dragged Mr. Sanders the rest of the way to the Deputy Keller's vehicle where defendants Haynes and Kujawa followed.

120. Unable to walk on his own, Mr. Sander's feet were dragging behind him all the way to defendant Keller's vehicle. Each of the arresting defendants were still in close proximity and would have been able to observe this.

121. When defendants Bailey, Smith and Keller tried to stand Mr. Sanders up against defendant Keller's vehicle, Mr. Sanders again crumpled to the ground, unable to stand.

122. Defendant McIntyre described Mr. Sander's conduct as Mr. Sanders turning to "dead weight."

123. Defendants Smith and Keller picked Mr. Sanders back up and leaned him against defendant Keller's vehicle to be searched.

124. Mr. Sanders, unable to stand, began to slide back to the ground.

125. Defendant Keller grabbed Mr. Sander's hands and lifted his arms over his head.

126. Mr. Sanders was unable to hold his head up, and defendant Kujawa held Mr. Sanders head up while defendant Keller held Mr. Sanders arms up behind his back and above his head.

127. Mr. Sanders can be heard begging please and saying, "I can't breathe." Each of the

128. Defendant Smith yells, "No one is hurting you. Stand up like a man."

129. Defendant Smith searched Mr. Sanders while defendants Kujawa and Keller held Mr. Sanders suspended by his arms and head.

130. The search of Mr. Sanders did not discover any contraband, only a condom.

131. When Mr. Sanders was stumbling and falling, Defendant Chavez-Perez asked loudly if Mr. Sanders had swallowed anything.

132. Each time that the arresting defendants lifted Mr. Sanders by his arms and carried him with his shoulders pulled back, they created a position like being hog tied, or spit roasted, causing temporary asphyxiation.

133. All officers with North Carolina Basic Law Enforcement training are taught to avoid positional asphyxiation with persons in custody. The policy of the Rutherford County Sheriff's Office also calls for officers to avoid positional asphyxia with prisoners.

134. During the above-described incidents prior to arriving at Keller's vehicle, the arresting defendants stated loudly that they believed Mr. Sanders had swallowed something, presumably drugs. These statements were loud enough for all of the other officers to hear the belief that Mr. Sanders may have swallowed drugs or some other substance.

135. Defendant Haynes also said that he believed Mr. Sanders may have ingested something.

136. After running from the officers, and then being placed in custody, Mr. Sanders showed classic symptoms of heart or respiratory distress, including shortness of breath, dizziness, fainting, inability to walk, confusion, inability to talk, inability to hold his head upright, and other serious symptoms.

137. Numerous arresting defendants and officers on the scene voiced their belief that Mr. Sanders may have ingested drugs to conceal them from the officers.

138. If the arresting defendants believed that Mr. Sanders had consumed an overdose of narcotics or other controlled substances, that would have been consistent with his behavior of being unable to walk, seeming confused, and not being able to hold up his head.

139. The arresting defendants' explicit belief that Mr. Sanders had consumed an overdose of illegal drugs, or any substance causing his behavior, warranted that they treat his condition as a medical emergency that required immediate medical attention.

140. Special Agent Joseph Magilton of the United States Department of Homeland Security was observing the events on January 24, 2020.

141. Special Agent Magilton saw Mr. Sanders say he was tired and drop to the ground while he was being brought from the yard of the private residence toward defendant Keller's vehicle.

142. Special Agent Magilton observed the defendants Keller and Bailey and another unknown officer carry Mr. Sanders, to a vehicle by the road while hanging him from his arms and hand cuffs.

143. Special Agent Magilton observed the search of Mr. Sanders.

144. Special Agent Magilton heard Mr. Sanders say, "I can't breathe" at least two different times.

145. Defendants Owens, Haynes, Kujawa, Chavez-Perez, Smith and Keller, as well as possibly some of the other arresting defendants, were all closer to Mr. Sanders than Agent Magilton, and they would have been able to hear Mr. Sanders saying, "I can't breathe."

146. Mr. Sanders was barely able to advise defendant Owens of his name.

147. After Mr. Sanders was placed in defendant Keller's vehicle, but before the door was closed, Special Agent Magilton heard Mr. Sanders ask defendant Owens to take his shirt off because he could not breathe.

148. This was the second time that Mr. Sanders stated that he could not breathe while defendants Owens, Haynes, Kujawa, Chavez-Perez, Smith and Keller, as well as possibly some of the other arresting defendants, were all closer to Mr. Sanders than Agent Magilton

149. Special Agent Magilton heard defendant Owens tell Mr. Sanders that he could breathe since he was able to talk, disputing Mr. Sander's claim that he could not breathe.

150. Defendants Haynes, Kujawa, Chavez-Perez, Smith and Keller, as well as possibly some of the other arresting defendants were close enough to Mr. Sanders to hear defendant Owens refuse to help with his shirt or hoody.

151. During this time, Mr. Sander's voice was barely audible, gasping, and slow.

152. Defendant Owens then told Mr. Sanders several times to relax.

153. Defendant Owens tried to place Mr. Sander's seat belt on him unsuccessfully.

154.  Upon information and belief, defendant Owens pushed Mr. Sander's legs into defendant Keller's vehicle and wedged his left leg into the seat.

155.  Defendant Owens then closed Mr. Sanders into Deputy Keller's vehicle.

156.  Special Agent Magilton was able to hear Mr. Sanders mumbling and making noise just before the door was closed and then saw Mr. Sanders leaning against the window after the door was closed.

157.  Defendant Keller left Mr. Sanders unattended in his vehicle for approximately five minutes after defendant Owen closed Mr. Sander in the vehicle.

158.  Despite being close enough to hear Mr. Sanders say that he could not breathe and hearing him request that his shirt be removed because he could not breathe, defendant Keller stood around celebrating about the arrest with other arresting defendants, including defendants Haynes, Owens, Deaton and McIntyre, as well as other officers.

159.  Defendant McIntyre then asked other officers to take him to his home to get an inhaler because he was having breathing difficulties after the foot pursuit.

160.  Defendant Chavez-Perez and another of the arresting defendants talked about Mr. Sanders "turning to a crying little bitch" when they threatened him with the bite dog.

161.  Defendant Chavez-Perez, then stated that they should give Mr. Sanders his condom back because he was going to need it in the jail that night, implying that he might be raped because he was scared of the dog.

162.  Defendant Keller began his transport of Sanders to Rutherford County Sheriff's Office/Rutherford County Detention Center (hereafter RCSO or RCDC) at approximately 5:18 p.m.

163. Defendant Keller's vehicle windows appear to be fully rolled up before Mr. Sanders was placed in defendant Keller's vehicle.

164. According to defendant Keller, Mr. Sanders advised him twice on the way to the RCSO that he was hot.

165. Defendant Keller claims he rolled down his window to provide air circulation for Mr. Sanders. However, surveillance camera footage of RCSO was obtained and shows the rear passenger door of defendant Keller's vehicle with a window barely cracked.

166. At all times during Keller's route to the RCSD/RCDC there was an EMS station and Rutherford Regional Hospital within a mile of the RCSO/RCDC. Rutherford Regional Hospital was included as an emergency medical center in the Operation Plan provided to all law enforcement officers assisting in the interdiction operation, and the hospital was closer to the arrest scene than the RCSD/RCDC.

167. Although defendant Keller was equipped with a body-worn camera at all times described herein, defendant Keller did not activate the body-worn camera during the transport of Mr. Sanders.

168. Defendant Keller's vehicle was also equipped with an onboard camera, but defendant Keller did not activate the onboard camera either.

169. At 5:31p.m., defendant Keller called to the RCSD/RCDC that he was going to need deputies or jailers to assist him with Mr. Sanders.

170. Defendant Sprouse remembered the call from defendant Keller as being "10-73" meaning that the person in custody, Mr. Sanders, possibly had mental issues.

171. Defendant Keller apparently rejected the idea that Mr. Sanders may have swallowed controlled substances or was simply suffering from a serious medical emergency because

he called in for assistance with a mental case instead of an overdose or medical emergency.

172. Defendant Keller arrived at the RCSO/ RCDC at approximately 5:33 p.m.

173. Approximately one minute later, defendant Sprouse arrived with three other officers— including defendant John Cooley, defendant Joshua Goodwin and, upon information and belief, Bryan Travis Smith.

174. At first, defendant Keller stepped away and left Mr. Sanders to the detention center officers.

175. Defendant Sprouse looked in Keller's vehicle to see Mr. Sanders apparently unconscious.

176. According to defendant Sprouse, Mr. Sander's eyes were only partially open, and he did not respond to verbal commands.

177. Defendant Sprouse failed to call for emergency medical services despite the fact that Mr. Sanders was in an obvious medical emergency situation.

178. When defendant Sprouse attempted to move Mr. Sander's legs out of defendant Keller's vehicle, she noticed that his left leg was "wedged" in the back seat.

179. Defendant Sprouse then attempted to pull Mr. Sanders out of the vehicle by his arms.

180. Mr. Sanders fell out of the vehicle unconscious.

181. Mr. Sanders was obviously unconscious and unresponsive at this point lying on the ground in front of defendants Keller, Sprouse, Goodwin and Cooley.

182. Upon information and belief, each of the detention defendants carried a radio and a phone, and each had the ability to independently call for EMS or other medical assistance during the time that Mr. Sanders was in their custody.

183. The detention officers Sprouse, Goodwin and Cooley failed to call 911 or to seek emergency treatment for an unconscious arrestee or prisoner who was presented to them by defendant Keller in a law enforcement vehicle that had arrived at their facility.

184. Instead of seeking emergency medical help, defendants Keller and defendant Cooley lifted Mr. Sanders under his arms, which were still handcuffed behind his back, and dragged him into the Detention Center, once again hanging Mr. Sanders by his arms.

185. Defendants Sprouse and Goodwin walked along with Keller and Cooley and the unconscious Mr. Sanders.

186. Mr. Sanders was dragged unconscious, hanging by his arms, into the detention center where he was taken through a Sally port, or two sets of locked doors.

187. The detention defendants again failed to call for emergency medical services for an unconscious man who was presented to the Rutherford County Detention Center.

188. Mr. Sanders was taken to the juvenile holding cell where he was laid face down on his stomach with his hands still cuffed behind his back.

189. The detention defendants obtained an ammonia sniffing stick or device to see if Mr. Sanders would respond to it or if he was "really unconscious."

190. Finally, defendant Sprouse attempted to find a pulse for Mr. Sanders.

191. After being unable to find a pulse, defendant Sprouse finally removed Mr. Sander's handcuffs so that his arms would not be pulled behind his back.

192. Defendant Keller called for an ambulance at 5:40p.m.

193. Upon information and belief, defendant Keller stated that Mr. Sanders had swallowed narcotics, causing jail staff to administer Narcan or Naloxone to Mr. Sanders before EMS arrived.

194. EMTs arrived on the scene at approximately 5:43p.m.

195. Defendant Keller almost immediately told EMTs that he believed Mr. Sanders had swallowed something.

196. One of the detention defendants later told EMTs that they believed Mr. Sanders was "pretending to be asleep when he arrived at the jail."

197. EMTs were unable to resuscitate Mr. Sanders, and he was pronounced dead at 6:09 p.m. by the EMTs.

198. An autopsy determined that Mr. Sanders died from dilated cardiomyopathy, a type of heart failure.

199. There was no alcohol in Mr. Sander's system.

200. The only drug found in Mr. Sander's system was the Narcan or Naloxone administered in the jail, by jail employees.

201. Defendant Keller later stated that Mr. Sanders was conscious and talking until they reached the parking lot of the RCSO.

202. Dilated cardiomyopathy can lead to heart arrhythmia.

203. Some arrhythmias can resolve with rest, some require oxygen or medication, and some require defibrillation or electric shock to resolve.

204. Mr. Sanders would have survived with prompt medical treatment.

**FIRST CLAIM FOR RELIEF**

(42 USC §1983 Eighth, Fourteenth and Fourth Amendment Violations --- Deliberate Denial or Indifference to Serious Medical Need --- Defendant Ryan Bailey, in his individual capacity, and Arresting Defendants, in their individual capacities)

205. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

206. During all relevant times described above, Jackie Israel Sanders was bleeding from his face and complaining that he needed to rest for just a few minutes.

207. Several of the arresting defendants believed that Mr. Sanders had ingested narcotics or other controlled substances prior to his arrest.

208. Numerous officers, including several of the arresting defendants, on the scene of this arrest stated loudly that they believed Mr. Sanders had ingested drugs or some substance.

209. An overdose of controlled substances by a suspect who is in custody creates a medical emergency.

210. Mr. Sanders was unable to walk under his own power.

211. Mr. Sanders was lying on the ground, his face down in the grass, with his hands cuffed behind him.

212. Mr. Sanders had been barely able to talk.

213. Mr. Sanders appeared to be barely conscious, and in a stupor.

214. It would have been obvious to a lay person and, based upon their training and experience, it was or should have been obvious to each of the arresting defendants that Mr. Sander's condition required prompt medical attention.

215. Defendant Sergeant Matt Owens recognized the medical emergency and began to call for an ambulance.

216. However, defendant Bailey and other arresting defendants interrupted the call for medical assistance and intervened, objecting to defendant Owen's suggestion to call for an ambulance.

217. Defendant Bailey and others of the arresting defendants were obviously angry with Mr. Sanders for running from them after they pointed guns at him and did not tell him for over two minutes why he was being stopped or arrested.

218. Defendant Bailey and the other arresting defendants decided that Mr. Sanders, as an arrested suspect, should be punished for running from them.

219. At all material times, Mr. Sanders was in custody, with his hands cuffed behind him, and he was no longer a threat to any of the defendants.

220. However, the arresting defendants did not want to allow him to catch his breath or to receive medical assistance.

221. The arresting defendants, and particularly defendant Bailey, made the medical decision that, because he and the other arresting officers did not need medical attention for themselves after running the same distance, with all of their vests and heavy gear, Mr. Sanders should not need or receive medical attention either.

222. Due to running the same distance as Mr. Sanders, Defendant McIntyre did need medical treatment in the form of an inhaler, and the other arresting officers, including defendant Bailey, promptly took defendant McIntyre to his residence to rest and get medication.

223. Apparently, defendant Owens also reached the conclusion that Mr. Sanders did not deserve medical attention after being told that the other arresting officers "ran just as far as he did."

224. Upon information and belief, the arresting officers made the decision to deny Mr. Sanders medical attention in anger and bad faith to punish Mr. Sanders for running.

27

225. This decision was made knowing that Mr. Sanders was asking for rest, was suspected of swallowing drugs or another unknown substance which was causing signs and symptoms of a medical impairment which rendered him unable to walk on his own, stand upright on his own, or talk coherently.

226. Despite this knowledge and belief, and after initially denying Mr. Sanders medical assistance, the arresting defendants dragged Mr. Sanders to defendant Keller's vehicle, hung him by his arms and searched him.

227. Each time that Mr. Sanders was lifted by his arms and hung by defendants Keller, Smith and Kujawa, Mr. Sanders' breathing was further restricted, exacerbating his cardiac and respiratory distress.

228. The arresting defendants continued to mistreat Mr. Sanders and deprive him of medical care even after he begged "Please!" and stated, "I can't breathe."

229. These statements were made in the presence of defendants Owens, Kujawa, Smith, Keller, Haynes and Chavez-Perez who were all closer to Mr. Sanders than Agent Magilton. Agent Magilton reported hearing Mr. Sanders saying that he could not breathe at least two times.

230. Even after defendant McIntyre stated that he needed medical assistance for breathing problems, and defendants Bailey and others, promptly attended to this need, they did not change their positions about denying care for Mr. Sanders.

231. Mr. Sanders again asked defendant Owens, who at one point had been ready to call for an ambulance, for help removing his hoodie, and again said, "I can't breathe."

232. Defendant Owens told Mr. Sanders that he could not help him because he was under arrest. This statement was false. Defendant Owens then wedged Mr. Sander's legs in

28

the vehicle and closed the door, where Mr. Sanders was left unattended for approximately five more minutes despite saying he could not breathe.

233. During this time, the arresting defendants were indifferent to Mr. Sander's obvious medical needs.

234. Defendants Bailey and Deaton stood around talking about how they thought they were going to have to "shoot the mother freaker."

235. Agent Chavez-Perez joked about, upon information and belief with defendants Smith, Kujawa, and Haynes, about how Mr. Sanders cried about not wanting the dog to bite him, and how Mr. Sanders might need his condom his first night in jail.

236. The arresting defendants' acts or omissions were deliberately indifferent to Jackie Israel Sander's known or suspected serious medical needs, thereby depriving him of due process under the Fourteenth Amendment, inflicting cruel and unusual punishment in violation of the Eighth Amendment and/or constituting an unreasonable seizure under the Fourth Amendment.

237. The claims for violations of these constitutional rights by the arresting defendants are enforceable through 42 U.S.C. § 1983, et seq.

238. Plaintiff respectfully requests this Court to enter judgment, jointly and severally against all of the arresting defendants named above, in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

(42 USC §1983 Eighth, Fourteenth and Fourth Amendment Violations --- Deliberate Denial or Indifference to Serious Medical Need --- Defendants Keller, Sprouse, Cooley and Goodwin in their individual capacities)

29

239. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

240. After leaving the scene of the arrest, defendant Keller continued to deny Mr. Sanders needed medical attention.

241. Defendant Keller was aware that Mr. Sanders may have ingested controlled substances or for some other medical reason was barely conscious and had stated at least twice that he could not breathe.

242. Defendant Keller knew or should have known from his training and experience, and from the information that he gathered at the arrest scene that Mr. Sanders was in need of emergency medical care.

243. On the way to the Rutherford County Detention Center, defendant Keller made the medical decision that Mr. Sanders was 10-73 or having some mental episode.

244. Defendant Keller called ahead to the RCDC and spoke with defendant Sprouse. Keller indicated that he would need assistance with a prisoner who was 10-73.

245. However, rather than taking Mr. Sanders to the Rutherford Regional Hospital—which was closer to the scene of arrest than the RCDC—defendant Keller continued to deny Mr. Sanders any medical attention.

246. At all times while defendant Keller transported Mr. Sanders to the RCDC, defendant Keller decided against taking Mr. Sanders to Rutherford Regional Hospital, and instead decided to take Mr. Sanders to the RCDC —which was further from the scene of arrest.

247. Upon arriving at the RCDC, defendant Keller waited for detention officers even though, upon information and belief, he was aware that Mr. Sanders was unconscious.

248. After approaching defendant Keller's vehicle, defendants Sprouse, Cooley and Goodwin became aware that Mr. Sander was unconscious.

249. Defendant Sprouse poked and pulled on Mr. Sanders, pulling him by his arms until he fell unconscious to the pavement of the parking lot in front of defendants Keller, Cooley and Goodwin.

250. At this point, defendants Keller, Sprouse, Cooley and Goodwin knew that failing to provide medical assistance to an unconscious prisoner presented a substantial risk of harm for the unconscious prisoner or arrestee.

251. Upon information and belief, each of the detention defendants had radios or telephones or access to them inside the RCDC. Instead of seeking immediate medical attention, each of the detention defendants took custody of Mr. Sanders from defendant Keller.

252. With the assistance of defendant Keller, defendant Cooley dragged the unconscious Mr. Sanders into the detention center. Mr. Sanders was dragged in front of detention personnel, and then detained behind two locked doors and placed in a "juvenile cell."

253. All of the detention defendants' acts or omissions were deliberately indifferent to Jackie Israel Sander's obvious, serious medical needs, thereby depriving him of due process under the Fourteenth Amendment, inflicting cruel and unusual punishment in violation of the Eighth Amendment and/or constituting an unreasonable seizure under the Fourth Amendment.

254. The claims for violations of these constitutional rights by the detention defendants are enforceable through 42 U.S.C. § 1983, et seq.

255. Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF

(Bystander Liability under 42 U.S.C. § 1983 --- Arresting and Detention Defendants)

256. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

257. At all times relevant hereto, the arresting and detention defendants named above were sworn law enforcement officers with the Rutherford County Sheriff's Department or the Polk County Sheriff's Department and acted under the color of state law and exercised power possessed by virtue of state law as sworn law enforcement officers.

258. This cause of action is brought against them in their respective individual capacities.

259. During all relevant times herein, upon information and belief, each of the arresting defendants (Bailey, McIntyre, Deaton, Haynes, Smith, Kujawa, Owens, Chavez-Perez, and Keller) were present during some or all of the unlawful and excessive actions described in this complaint against Jackie Israel Sanders, and/or during the unlawful and indifferent failure to provide medical assistance for Mr. Sanders.

260. Defendants Bailey, McIntyre, Deaton, and Haynes all remained in close proximity to Mr. Sanders, and each other, throughout the events described in this complaint until Mr. Sanders was taken to the RCDC by defendant Keller. Each of these four had the opportunity to observe the condition of Mr. Sanders and to observe the conduct of the other arresting defendants in violation of Mr. Sander's rights.

32

261. Defendant Smith arrived on the arrest scene moments after Mr. Sanders was cuffed and in custody. He remained in close proximity to Mr. Sanders, even carrying him at times. Defendant Smith was able to observe the conduct of the other arresting defendants in violation of Mr. Sander's rights.

262. Defendant Kujawa arrived on the arrest scene moments after Mr. Sanders was cuffed and in custody. He remained was in a position to observe the other defendants carry Mr. Sanders out of the woods and into the residential yard. He was able to observe Mr. Sander's condition and his falling numerous times prior to the point where defendants Bailey, Keller and another arresting officer (perhaps Kujawa), began dragging and carrying Mr. Sanders to defendant Keller's vehicle. Defendant Kujawa was able to observe the conduct of the other arresting defendants in violation of Mr. Sander's rights.

263. Defendant Chavez-Perez arrived on the arrest scene prior to the time Mr. Sanders was placed in hand cuffs. He held his gun aimed at Mr. Sanders in the wooded thicket, and he entered the woods prior to or about the time that Mr. Sanders was cuffed. Defendant Chavez-Perez gave orders to Mr. Sanders to keep his hands up while he was still standing, and he was close enough to observe Mr. Sanders fall numerous times before Mr. Sanders was put in handcuffs. Defendant Chavez-Perez remained in close proximity to Mr. Sanders and the other arresting defendants until Mr. Sanders was placed in defendant Keller's vehicle when defendant Chavez-Perez made the remark that Mr. Sanders was a "crying little bitch" and he was "going to need his condom when he gets to jail."

264. Defendant Owens arrived on the arrest scene while Mr. Sanders was still in the wooded area. Defendant Owens was able to observe the other arresting defendants bring Mr. Sanders out of the wooded, brushy area into the residential yard. From that point he was able to observe Mr. Sanders fall several times, being supported or carried by the other arresting defendants.

265. Defendant Owens was able to observe Mr. Sander's condition and ask the other arresting defendants if Mr. Sanders needed an ambulance. Defendant Owens later stated to a NC-SBI agent that he asked Mr. Sanders if he needed an ambulance and Mr. Sanders indicated "no" he did not. Body worn camera videos of defendants Bailey and Haynes, as well as others do not show Mr. Sanders responding in any way. The body worn videos show defendant Bailey and others immediately responding that Mr. Sanders did not need an ambulance. Defendant Owens was able to observe all of this conduct by the other arresting defendants.

266. Each of the arresting defendants (Bailey, McIntyre, Deaton, Haynes, Smith, Kujawa, Owens, Chavez-Perez, and Keller) had the opportunity to prevent the harm to Mr. Sanders due to their close proximity to him and the others. Each had their own radios and phones with the opportunity and ability to call for an ambulance, and each had the opportunity to intervene and insist that the other officers allow Mr. Sanders to rest and receive medical attention.

267. During all relevant times herein, upon information and belief, each of the detention defendants were present during some of the unlawful and excessive actions against Jackie Israel Sanders and/or during the unlawful and indifferent failure to provide medical assistance for Mr. Sanders.

268. Defendant Keller arrived at the RCDC with Mr. Sanders in an unconscious state.

269. Defendants Sprouse, Cooley and Goodwin responded to defendant Keller's request for assistance at the jail.

270. Each of the detention defendant had the opportunity to observe Mr. Sanders dire condition as defendant Sprouse drug him out of defendant Keller's vehicle and he fell to the pavement like a sack of potatoes.

271. None of the detention defendants provided first aid, checked for a pulse or called for an ambulance despite the fact that all of them had radios and phones and the opportunity to call for assistance.

272. Defendants Sprouse and Goodwin observed defendants Keller and Cooley drag Mr. Sanders in an unconscious state from the parking lot into the jail.

273. Each of these detention defendants could observe that defendant Keller was depriving Mr. Sanders of medical attention in violation of his constitutional rights.

274. Upon information and belief, each of the arresting and detention defendants had knowledge of and witnessed the conduct of each other in violating Mr. Sander's constitutional rights through application of an unlawful or excessive seizure and/or use of excessive force, and through the deliberate indifference or intentional denial of serious medical needs.

275. Each of the arresting and detention defendants had the power to prevent a fellow officer's illegal acts, regardless of rank, as no Rutherford County Sheriff's deputy or Polk County Sheriff's deputy is entitled to violate the law or is otherwise required to obey unlawful orders.

276. Upon information and belief, each of the arresting and detention defendants witnessed and had knowledge of the unlawful seizure and excessive force used on Mr. Sanders by the other defendants at various times.

277. Each of the arresting and detention defendants, at various times, had a reasonable opportunity to prevent such unlawful seizure, use of excessive force, and deprivation of medical care for a serious medical need by their fellow officers, yet each chose not to act.

278. As a direct and proximate result of the failures of each arresting and detention defendant to intervene as the opportunities presented themselves, the fellow officers continued to violate Mr. Sander's constitutional rights.

279. Upon information and belief, each of the arresting and detention defendants had a reasonable opportunity to prevent such unlawful seizure, use of excessive force, and depravation of medical care by their fellow officers, yet they chose not to act.

280. As a direct and proximate result of each defendant's failures to intervene, their fellow officers continued to violate Mr. Sander's constitutional rights.

281. As sworn law enforcement officers at the scene, each of these defendants had a duty and obligation to prevent their fellow officers from unlawfully detaining Mr. Sanders and to order them to cease their use of excessive force on him as soon as it began. Further, each of these defendants has the duty and obligation to call for emergency medical attention which was obviously needed and to prevent their fellow officers from depriving Mr. Sanders of needed medical attention.

282. As a direct and proximate result of the knowing, willful and gross failures by each of the arresting and detention defendants in declining to intervene to stop the unlawful

seizure and the unlawful use of excessive force on Mr. Sanders, and further depravation of medical care, Mr. Sanders suffered damages, including constitutional injuries, physical injuries, and tremendous and irreparable damages, including death.

283. Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

(Wrongful Death Pursuant to NCGS § 28A-18-2 --- Arresting Defendants)

284. Plaintiff re-alleges and incorporates herein all preceding paragraphs as if fully set forth herein.

285. The actions of the arresting defendants described above were negligent, grossly negligent, reckless, willful, wanton, and intentional.

286. The arresting defendants owed the decedent, Jackie Israel Sanders, a duty to provide needed medical services from the time he was taken into their custody by the defendant Bailey.

287. The duty to provide needed medical services to Mr. Sanders was greater than the discretionary duty owed by law enforcement officers to the general public because individuals in custody do not have the ability to obtain medical services for themselves.

288. The arresting defendants owed the decedent Mr. Sanders a duty to not use excessive force in maintaining custody of Mr. Sanders.

289. The arresting defendants owed the decedent Mr. Sanders a duty to not punish Mr. Sanders during his arrest.

290. The arresting defendants owed the decedent Mr. Sanders a duty to not deprive him of necessary emergency medical treatment.

291. The arresting defendants knew or should have known from their Basic Law Enforcement Training that Mr. Sanders was exhibiting signs and symptoms consistent with heart failure, respiratory distress, and/or drug overdose, all of which are serious medical emergencies.

292. The arresting defendants were trained, or should have been trained, in "triage" or sorting casualties into priority for emergency care or transportation to definitive care.

293. BLET teaches law enforcement officers to be first responders and to sort medical need priority levels by color: Green, Yellow, Red and Black, depending on severity.

294. All of the levels of triage require officers to check the subject's pulse first and foremost.

295. BLET also teaches law enforcement officers to recognize many medical emergencies, including but not limited to: drugs, head injuries, diabetic, heat and cold emergencies, cardiac emergencies, stroke and seizures.

296. The defendant Chris Francis, Rutherford County Sheriff, had a written policy applicable to "all deputies.", which was in effect on the day Mr. Sanders was arrested

297. The written policy of the Rutherford County Sheriff requires all deputies "will continually monitor the medical condition of the prisoner. Prisoners should not be left alone in a car or a room for any extended period of time. Deputies should look at and talk frequently to prisoners in custody, especially when they are restrained by handcuffs or other restraints."

298. The written policy of the Rutherford County Sheriff requires all "deputies will closely monitor any prisoner who is highly excited due to strenuous activity such as attempting to escape, resisting arrest, or assaultive behavior and/or displays any or all of the characteristics below:

    a.  Prisoners who are suspected of being substantially impaired or under the influence of alcohol or drugs;

    b.  Prisoners who are breathing very rapidly, sweating heavily, or who have cold clammy skin;

    c.  Prisoners engaging in deranged and/or irrational conduct or speech;

299. The written policy of the Rutherford County Sheriff requires "IMMEDIATE medical attention will be provided whenever a prisoner:

    a.  Loses consciousness;

    b.  Stops breathing;

    c.  Suddenly becomes incoherent;

    d.  Begins to hyperventilate;

    e.  Begins to look very sick; or

    f.  Otherwise shows signs of needing immediate medical attention.

300. The written policy of the Rutherford County Sheriff requires "Avoidance of Positional Asphyxia." The policy states that "hog-tied" is the most likely position to cause positional asphyxia, but "simply being handcuffed behind (the preferred method for safety reasons) and being placed face down could cause positional asphyxia."

301. The arresting defendants continued to place Mr. Sanders, who was in obvious medical distress into positions causing positional asphyxia, making Mr. Sanders even more unlikely to recover without medical intervention.

302. The arresting defendants breached their duties to Mr. Sanders by negligently, grossly negligently or recklessly and willfully and wantonly failing to recognize that Mr. Sanders was having a medical emergency.

303. The arresting defendants breached their duties to Mr. Sanders by negligently, grossly negligently or recklessly and willfully and wantonly failing to act upon Mr. Sander's recognized medical emergency.

304. In the alternative, the arresting defendants were deliberately indifferent to or intentionally disregarded Mr. Sander's medical emergency.

305. These actions and omissions by the arresting defendants were the proximate cause of Mr. Sander's injuries, suffering and death.

306. Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

(Wrongful Death Pursuant to NCGS § 28A-18-2 --- Detention Defendants)

307. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

308. The actions of the detention defendants described above were negligent, grossly negligent, reckless, willful, wanton, and intentional.

40

309. The detention defendants owed the decedent, Jackie Israel Sanders, a duty to provide needed medical services from the time he was delivered into their custody by the defendant Keller.

310. The duty to provide needed medical services to Mr. Sanders was greater than the discretionary duty owed by law enforcement officers to the general public because individuals in custody do not have the ability to obtain medical services for themselves.

311. The detention defendants owed the decedent Mr. Sanders a duty to not use excessive force in maintaining custody of Mr. Sanders, and to not punish Mr. Sanders or deprive him of necessary emergency medical treatment.

312. The detention defendants knew or should have known from their Basic Law Enforcement Training that Mr. Sanders, who was unconscious from the time he was delivered to them was exhibiting signs and symptoms consistent with heart failure, respiratory distress, and/or drug overdose, all of which are serious medical emergencies.

313. The detention defendants were trained, or should have been trained, in "triage" or sorting casualties into priority for emergency care or transportation to definitive care.

314. BLET teaches law enforcement officers to be first responders and to sort medical need priority levels by color: Green, Yellow, Red and Black, depending on severity.

315. All of the levels of triage require officers to check the subject's pulse first and foremost.

316. BLET also teaches law enforcement officers to recognize many medical emergencies, including but not limited to: drugs, head injuries, diabetic, heat and cold emergencies, cardiac emergencies, stroke and seizures.

317. The detention defendants, starting with defendants Keller and then Sprouse, disregarded their teaching and department policies and failed to seek immediate medical attention for Mr. Sanders.

318. Defendant Keller and Defendant Sprouse did not check for a pulse or breathing.

319. Even though defendant Keller stated that Mr. Sanders was conscious just before arriving at the RCDC, defendants Keller and Sprouse did not call for emergency medical services or provide emergency medical services for Mr. Sanders.

320. Defendant Sprouse proceeded to drag Mr. Sanders from defendant Keller's vehicle in an unconscious state, dropping him onto the pavement of the RCDC parking lot.

321. Defendant Sprouse then proceeded to take custody of Mr. Sanders from defendant Keller and further proceeded to detain Mr. Sanders in the RCDC in an unconscious state.

322. Defendant Keller and defendant Cooley, rather than calling for emergency medical attention, proceeded to pick Mr. Sanders up by his arms which were still hand cuffed behind his back and drag him into the detention center.

323. Defendant Goodwin stood by and then assisted the other detention defendants with taking custody of Mr. Sanders and detaining him behind at least two sets of locked doors in the juvenile cell of the RCDC, making it even more difficult for Mr. Sanders to receive emergency medical services.

324. The detention defendants breached their duties to Mr. Sanders by negligently, grossly negligently or recklessly and willfully and wantonly failing to recognize that Mr. Sanders was having a medical emergency.

325. The detention defendants breached their duties to Mr. Sanders by negligently, grossly negligently or recklessly and willfully and wantonly failing to act upon Mr. Sander's recognized medical emergency.

326. In the alternative, the detention defendants were deliberately indifferent to or intentionally disregarded Mr. Sander's medical emergency.

327. These actions and omissions by the detention defendants were the proximate cause of Mr. Sander's injuries, suffering and death.

328. Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

(Wrongful Death Pursuant to NCGS § 28A-18-2 --- Defendant Chris Francis, in his official capacity)

329. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

330. The defendant Sheriff Chris Francis is the Sheriff of Rutherford County.

331. A sheriff's deputies in North Carolina act for the Sheriff as the agents or alter egos of the Sheriff.

332. The actions described above by the arresting and detention defendants, as agents of defendant Chris Francis were negligent, grossly negligent, reckless, willful and wanton.

333. In the alternative, the actions of the agents of defendant Chris Francis were deliberately indifferent to or intentionally disregarded Mr. Sander's medical emergency.

334. These actions and omissions by the agents of defendant Francis were the proximate cause of Mr. Sander's injuries, suffering and death.

335. Defendant Chris Francis, as Sheriff, and The Office of the Rutherford County Sheriff's Department, are responsible for the acts of their agent officers or deputies as set forth in this complaint.

336. Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor against the Rutherford County Sheriff for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

(Wrongful Death Pursuant to NCGS § 28A-18-2 --- Defendant Sheriff Tim Wright in his official capacity)

337. Plaintiff re-alleges and incorporates herein all preceding and succeeding paragraphs as if fully set forth herein.

338. The defendant Tim Wright is the Sheriff of Polk County.

339. A sheriff's deputies in North Carolina act for the Sheriff as the agents or alter egos of the Sheriff.

340. The actions described above by defendants Jeff Smith and Josh Kujawa as agents of defendant Sheriff Tim Wright were negligent, grossly negligent, reckless, willful and wanton.

341. In the alternative, the actions of the agents of defendant Sheriff Tim Wright were deliberately indifferent to or intentionally disregarded Mr. Sander's medical emergency.

342. These actions and omissions by the agents of defendant Sheriff Wright were the proximate cause of Mr. Sander's injuries, suffering and death.

343. Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

WHEREFORE, Plaintiff prays for a trial by jury and for the following relief:

1. Judgment against each of the Defendants, individually and jointly and severally.

2. For actual damages, special damages, and compensatory damages as provided by law in an amount to be determined by the jury.

3. For punitive damages, to be assessed individually and jointly and severally, in an amount to be determined by the jury.

4. For injunctive relief as deemed just and proper.

5. For costs of this action and reasonable attorney's fees.

6. For all such other and further relief this Honorable Court deems just and proper.

This the 5th day of November, 2021.

GRIMES TEICH ANDERSON, LLP
Attorney for Plaintiffs

*/s/Brian A. Buchanan*
Brian A. Buchanan
NC Bar No. 17342
535 College Street
Asheville, NC 28801
(828) 251-0800

Jake Erwin
SC Bar No. 79941
906 North Church Street
Greenville, SC 29601
(864) 316-2857

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2021, I electronically filed the foregoing *Amended Complaint* with the Clerk of Court using the CM/ECF system and served the document upon the attorneys shown below by depositing a copy hereof, postage prepaid, in the United States Mail, properly addressed as indicated.

Sean F. Perrin
Womble Carlyle
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202
sperrin@wcsr.com

This the 5th day of November, 2021.

GRIMES TEICH ANDERSON, LLP
Attorney for Plaintiffs

*/s/Brian A. Buchanan*
Brian A. Buchanan
NC Bar No. 17342
535 College Street
Asheville, NC 28801
(828) 251-0800